UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TERRY L. KNIGHT,

                Plaintiff,

       v.

WAL-MART STORES, INC.,

                Defendant.

Case No. C08-5746RJB

ORDER GRANTING
DEFENDANT'S MOTION
FOR SUMMARY
JUDGMENT

      This matter comes before the Court on Defendant's Motion for Summary Judgment (Dkt. 24). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file herein.

## I. PROCEDURAL FACTS

      On October 6, 2008, the Plaintiff Terry L. Knight filed this case against Defendant Wal-Mart Stores, Inc. ("Wal-Mart") in Mason County Superior Court. Dkt. 1. Plaintiff alleges in his Complaint the following causes of action: Wrongful Termination, Employment Discrimination on the basis of Age and Physical Infirmities, Retaliation for Potential Worker's Compensation Liability, and Defamation, Libel and Slander. Dkt. 4.

Defendant removed the action to this Court on December 15, 2008 based on diversity of citizenship. Dkt. 1 (*citing* 28 U.S.C. § 1141). Defendant filed its Answer to Plaintiff's Complaint on December 22, 2008. Dkt. 5.

On January 14, 2009, Plaintiff filed a Demand for Jury Trial. Dkt. 7. Defendant asserted in a Joint Status Report filed on March 17. 2009 that Plaintiff's jury demand was untimely and a bench trial should be set. Dkt. 8. On March 25, 2009, the Court issued a Minute Order, which set this case for a Jury Trial to begin on January 11, 2010. Dkt. 9.

The Defendant on October 21, 2009, filed a Motion to Dismiss Untimely Jury Demand and Setting of Bench Trial (Dkt. 22) and a Motion for Summary Judgment (Dkt. 24). Plaintiff did not file a timely response. On November 13, 2009, Defendant filed a Reply in Support of Motion for Summary Judgment (Dkt. 28) and a Reply in Support of Motion to Dismiss Plaintiff's Untimely Jury Demand and for Setting of Bench Trial (Dkt.30) arguing Plaintiff's failure to respond should be taken as an admission that the motions have merit.

Plaintiff filed, on November 13, 2009, a Motion for Extension of Time to File Responses to Motion for Summary Judgment and Motion to Strike Untimely Jury Demand (Dkt. 32) stating that he was unfamiliar with the Court Rules on responsive deadlines and requested that the Court allow him to file responses that same day. On November 14, 2009, Plaintiff filed an Amended Motion for Extension of Time to File Responses to Motion for Summary Judgment and Motion to Strike Untimely Jury Demand (Dkt. 39) asking that the Court allow him to file his responses on November 14, 2009. On that day, Plaintiff did in fact file a Response to the Motion for Summary Judgment (Dkt. 33) and a Response to the Motion to Dismiss Untimely Jury Demand and for Setting Bench Trial (Dkt. 38).

On November 18, 2009, Defendant filed a Sur-Reply Pursuant to Local Rule 7(G) Requesting that the Court Strike Plaintiff's Response to Defendant's Motion for Summary Judgment and Response to Defendant's Motion to Strike Jury Demand (Dkt. 40) on the grounds that Plaintiff failed to show good cause for missing the deadline for his response. On November 20, 2009, Defendant filed a Response to Plaintiff's Amended Motion for Extension of Time to

File Responses to Motion for Summary Judgment and Motion to Strike Untimely Jury Demand (Dkt. 49) asserting that Plaintiff's negligence is not excusable and requesting that the Court award Defendant attorney fees and costs incurred as a result of Plaintiff's untimeliness.

On November 25, 2009, Plaintiff filed a Reply in Support of Amended Motion for Extension of Time to File Responses to Motion for Summary Judgment and Motion to Strike Untimely Jury Demand (Dkt. 52). This Court on November 25, 2009, granted the Plaintiff's Amended Motion for Extension of Time (Dkt. 39) and ordered that the Defendant's reply, if any, addressing the merits o f Plaintiff's responses must be filed by December 2, 2009 (Dkt. 54). On December 2, 2009, Defendant filed a Reply to the Plaintiff's Response to Defendant's Motion for Summary Judgment (Dkt. 56) and a Reply to the Plaintiff's Response to Defendant's Motion to Dismiss for Untimely Jury Demand and for Setting of Bench Trial (Dkt. 55). Defendant on December 3, 2009, filed an Errata (Dkt. 58) amending its Reply.

## II. <u>RELEVANT FACTS</u>:

Plaintiff was hired in June 1996 by Defendant Wal-Mart to work as an overnight stocker in Defendant's Shelton store. Dkt 25-2 at 40. On October 4, 2007, Defendant terminated Plaintiff's employment for Gross Misconduct. Dkt. 25-2 at 1. Specifically, Plaintiff was "terminated for using profanity on the salesfloor and threatening other associates." Dkt. 25-2 at 1.

### A. Plaintiff's Pre-termination Treatment:

Plaintiff alleges that a couple months before his termination, around August or September 2007, an assistant manager, Kurt Fritz (Plaintiff does not recall Mr. Fritz's last name and refers to him as Kurt in his deposition; defendant's Motion for Summary Judgment identifies Kurt as Mr. Kurt Fritz (Dkt. 24 at 11)) witnessed Plaintiff drop a jar of pickles and Plaintiff told Mr. Fritz that he had been "dropping things, because [his] arms were – [he] was having troubles with [his] arms they were going to sleep on [him] and pain...sleeping all the time." Dkt. 35 at 5.

Plaintiff also alleges that he told Mr. Fritz that he was unsure what was going on but was going to research the cause of the pain. Dkt. 35 at 5. Plaintiff asserts that this pain began around June 2007. Dkt. 35 at 5. Plaintiff contends that Mr. Fritz told him that he "should go have that

checked." Dkt. 35 at 5. Plaintiff states that he did not have the pain in his arms checked out because he "was in the process of hoping it would go away" and that he has "a lot of aches and pains like everybody else." Dkt .35 at 6. Plaintiff admits that he never told Kevin Johnston, the store manager, Doris Sturdevant, an assistant manager, or Alice Knutson, a support manager, that he was having trouble with his arm. Dkt. 25-2 at 58. Mr. Johnston states that he was never told about Plaintiff's wrist problem. Dkt. 25-2 at 63. Nicole Lindsay, an assistant manager, states that she never knew Plaintiff's arm problems. Dkt. 25-3 at 54.

Plaintiff contends that at the time of his termination he suffered from knee problems and elbow pain. Dkt. 4 at 20. Plaintiff alleges that he was performing all of the essential functions of his job, despite that his job involved hard physical labor. Dkt. 4 at 20. Plaintiff contends that he likely had knee surgeries in 2000, 2002, 2004 and 2007 and a knee replacement in 2006. Dkt. 35 at 5. Plaintiff maintains that he had ankle surgery in 2004. Dkt. 35 at 5. Plaintiff had "filed a SIF 2 (Self-Insurer Accident Report) No. W78789 due to an aggravation of his condition as a result of a fall he took on the job on or around September 14, 2002." Dkt. 4 at 22. Plaintiff states that there was no worker's compensation claim prosecuted for that injury. Dkt. 4 at 22. Plaintiff asserts that at the time of his termination he had a left knee replacement, but his knee "constantly ached to the point that I had to take pain medication." Dkt. 35 at 2. Plaintiff also contends that he had restricted knee flexion and his left leg was weaker and this made working on the ladders more difficult, which is why he worked in groceries because the Plaintiff could reduce the time he spent on a ladder. Dkt. 35 at 2. Ms. Knutson states that management "always kept [Plaintiff] over on the grocery side so he didn't have to go up and down ladders." Dkt. 36-3 at 9. Ms. Knutson also contends that there were times where Plaintiff would use foul language on the job when he bumped his knee because "he had surgery on his knee or something... and, of course, you are going to cuss because it hurts." Dkt. 36-3 at 9. Mr. Johnston states that he was unaware that Plaintiff took some "L&I" time off for his knee or any kind of physical ailment. Dkt. 25-2 at 63, 64.It is undisputed that Plaintiff was 52 years of age at the time of his termination. Dkt. 4 at 20. Plaintiff states that some people made jokes about this age. Dkt. 25-2 at 53. Specifically,

Plaintiff contends that "a couple different people in management [were] giving [him] a hard time because [he] was going up ladders with totes on [his] shoulders and saying [that he] was too old to doing that and this and that." Dkt. 25-2 at 53. Plaintiff states he thought that they were "just joking" but thought, "some of them might have been serious." Dkt. 25-2 at 53. Plaintiff admits that the managers who allegedly made these comments were no longer employed by Defendant and he could not recall specific names. Dkt. 25-2 at 53. Plaintiff also states that this happened maybe two or four years prior to his termination. Dkt. 25-2 at 53-54.

Plaintiff contends that Alice Knutson and Frankie (his last name and position at Wal-Mart is unknown (it is unclear from Plaintiff's deposition who Frankie is and what his role was at Wal-Mart) made some comments concerning his age; namely, Plaintiff states that the comments directed at him asked if he aspired to be more than just a stocker and become management at Wal-Mart. Dkt. 25-2 at 59. Plaintiff admits that he thinks Frankie was joking but "it hit a nerve with [him] a little bit." Dkt. 25-2 at 60. Mr. Johnston states that he was unaware of Plaintiff's age and that "there were lots of people who worked at the store that appear to be older...than [Plaintiff]." Dkt. 36-5 at 3.

Plaintiff maintains that while he worked at Wal-Mart there were other stockers that were older than him. Dkt 25-2 at 55. Particularly, Plaintiff states that "Rick in chemicals," who "was always limping," "Al in cereal," and Jim Miller. Dkt. 25-2 at 55-56. Plaintiff states that he knows that Jim retired from Wal-Mart after Plaintiff's termination and believes that Al and Rick are currently employed by Wal-Mart. Dkt. 25-2 at 57. Mr. Johnston states that he was unaware of Plaintiff's age. Dkt. 25-2 at 64.

## B. Plaintiff's Termination:

The events leading up to Plaintiff's termination are convoluted in the pleadings, but Defendant asserts it terminated Plaintiff's employment because Plaintiff got into an on-the-job confrontation with another associate, Spencer Sleight. Dkt. 25-3 at 58-59. Viewing the facts in the light most favorable to the nonmoving party (Plaintiff), there is some dispute as to the incident that ultimately resulted in Plaintiff's termination.

*i. The Confrontation*

On October 4, 2007, Plaintiff was working an overnight shift at Wal-Mart, stocking aisles. Dkt. 36-4 at 3. Plaintiff states that he was told by Mr. Sleight, another stocker, to download a pallet between Aisle 4 and Aisle 5. Dkt. 35 at 7. Plaintiff contends that he responded to Mr. Sleight that Plaintiff knew what he was supposed to do and that he was going to help another associate, Rick in chemicals, because that is what Plaintiff always did on that particular night and that Plaintiff did not have an assigned aisle. Dkt. 35 at 7. Plaintiff contends that Mr. Sleight then got angry and stormed off. Dkt. 35 at 7. Mr. Sleight contends that he overheard Plaintiff, from a couple aisles over, "bitching up a storm" about the aisle assignments. Dkt. 25-3 at 58.

Plaintiff states that, shortly after Mr. Sleight left, Plaintiff was called back to Nicole Lindsay's office - she was a new assistant manager at this time. Dkt. 35 at 7. Plaintiff states that he then told Ms. Lindsay that Mr. Sleight is a stocker, like Plaintiff, and is not supposed to tell Plaintiff what his job assignment is unless Ms. Lindsay told Mr. Sleight to relay Plaintiff's assignment to him. Dkt. 35 at 7. Plaintiff asserts that he told her that on that night he usually helps out Rick in another department. Dkt. 35 at 7. Plaintiff states that then Ms. Lindsay apologized for not letting him or the rest of the crew know that she had given Mr. Sleight permission to give assignments. Dkt. 35 at 7.

Plaintiff states that, as Plaintiff left Ms. Lindsay's office and was walking back to the salesfloor, Chelsea Puetz, another associate/stocker, pointed her finger at Plaintiff in a mocking manner because he "got called back to management." Dkt. 35 at 8. Plaintiff asserts that he walked up to Chelsea Puetz and asked that "if she had any issues if she would come to me and talk to me," because he had "heard a rumor again that she had told somebody something nasty about me." Dkt. 35 at 8. Chelsea Puetz said she went to management a few times about Plaintiff's behavior because she was concerned that Plaintiff was possibly using drugs and smelled like alcohol. Dkt. 25-3 at 16. Chelsea Puetz maintains that Plaintiff told her to keep her mouth shut and mind her own business and that this statement made her feel "intimidated" and afraid

Plaintiff "was going to beat [her] up for saying those things." Dkt. 25-3 at 15. Plaintiff asserts that he did not swear at Chelsea Puetz. Dkt. 9 at 15. Plaintiff states that then Chelsea Puetz started crying. Dkt. 25-2 at 45. Chelsea Puetz states that then she, Plaintiff and Mr. Sleight went on their scheduled breaks. Dkt. 25-3 at 15.

Chelsea Puetz asserts that during the break she was in the break room with her mother, Kathleen Puetz, another Wal-Mart employee, and Plaintiff walked in and said "you should have just kept your mouth shut." Dkt. 25-3 at 19. Chelsea Puetz contends that she was still crying and started "crying even harder" because she had told Plaintiff that she did not want him talking to her. Dkt. 25-2 at 25. Plaintiff claims he does not recall any incident in the break room with Chelsea Puetz or her mother, but recalls them "joking and laughing." Dkt. 25-2 at 46. Chelsea Puetz states that after this incident she and her mother immediately went to management to complain about Plaintiff's behavior and that Chelsea Puetz filled out a statement. Dkt. 25-3 at 26.

Chelsea Puetz contends that after break Plaintiff and Spencer continued to argue. Dkt. 25-3 at 16. Plaintiff states that Mr. Sleight "took offense" to his comments to Chelsea Puetz and Mr. Sleight came over to Plaintiff with his "fist clenched" and "bumped" Plaintiff in the chest with his chest and in the face with his nose and told Plaintiff to "take a swing at him." Dkt. 35 at 8. However, Mr. Sleight contends that he overheard Plaintiff "talking trash" a couple aisles over and told Plaintiff that if he has "got something to say, you want to say it to me?" Dkt. 25-3 at 58. Mr. Sleight states that then Plaintiff "comes flying out" of his aisle, gets "right up in [his] face," and they have a "baseball scrum." Dkt. 25-3 at 58. Mr. Sleight alleges that they were "nose to nose" and "chest to chest." Dkt. 25-3 at 59. Mr. Sleight states that he told Plaintiff that if he had something to say to say it to his face. Dkt. 25-3 at 59. Mr. Sleight contends that both he and Plaintiff used foul language. Dkt. 25-3 at 59. Mr. Sleight states that "the only time [Plaintiff] touched me was to push him away from him." Dkt. 25-3 at 60. Mr. Sleight asserts that he never pushed Plaintiff. Dkt. 25-3 at 60.

Chelsea Puetz states that Plaintiff and Mr. Sleight bumped chests and that Plaintiff told Mr. Sleight "that if [he] thought he was so tough, he would meet him out in the parking lot after

work and show him how tough he could be." Dkt. 25-3 at 16. Plaintiff alleges that he did not retaliate, that he did not swear at Mr. Sleight, and that he "smiled at [Mr. Sleight] and walked away and proceeded to work Aisle 4." Dkt. 35 at 8, 9. Plaintiff states that he did not report to management concerning the incident that night. Dkt. 35 at 8.

*ii. The Investigation into the Confrontation*

Prior to the confrontation, Plaintiff's work performance evaluations would be classified as fairly neutral. Dkt. 25-2 at 2-9. Plaintiff's 2007 evaluation does state that he "needs to keep a positive attitude" but also lists that Plaintiff "exceeds expectations." Dkt. 25-2 at 2. Kevin Johnston, the store manager, contends that both Mr. Sleight and Alice Knutson, a manager, had complained to him about Plaintiff's temper on several occasions before Plaintiff's confrontation with Mr. Sleight. Dkt. 25-2 at 66. Mr. Johnston states that Chelsea Puetz and her mother, Kathleen Puetz, had complained to him earlier about Plaintiff's behavior. Dkt. 25-2 at 68. Chelsea Puetz states that Plaintiff "started causing trouble for people towards the last couple of months" before his termination and that she thought that this was because he was coping with stress because of his divorce. Dkt. 25-3 at 13-14.

Mr. Johnston states that he heard about the confrontation because Mr. Sleight came and told him about it the next day. Dkt. 25-2 at 72. Mr. Johnston said that he conducted the investigation into the confrontation but also relied on input from the other managers. Dkt. 25-2 at 74. Mr. Johnston maintains that Mr. Sleight "told [him] that [Plaintiff] became upset with him and started shouting and using profanity and bumped him backwards with his chest." Dkt. 25-2 at 72. Mr. Johnston states that both Mr. Sleight and Jim Miller, a stocker who allegedly witnessed the incident, said that Plaintiff used "profanity and became aggressive towards Spencer and bumped him with his chest, knocking him backwards." Dkt. 25-2 at 70. Mr. Johnston contends that Mr. Sleight told him that Plaintiff was also yelling. Dkt. 25-2 at 70. Mr. Johnston maintains that he got written statements concerning the incident from Mr. Sleight and Mr. Miller. Dkt. 25-2 at 75. Mr. Johnston maintains that, after an exhaustive records search, he has not been able to locate these statements. (Defendant states that Mr. Johnson testified that it was his routine

practice to retain associate statements or any other such documentation on investigations in his locked file cabinet. Dkt. 25-2 at 20. Defendant further states that in the spring of 2008 and prior to commencement of this lawsuit, Wal-Mart gathered documents and files from store throughout Washington state, including the Shelton store, and moved these files to a warehouse for discovery in a Washington state class action litigation against Wal-Mart. Dkt. 25-2 at 21. Defendant contends that it has diligently searched for these statements but has been unable to locate them. Dkt. 25-2 at 21-22). Dkt. 25-2 at 75.

Mr. Johnston states that he also spoke with Nicole Lindsay and Plaintiff about the incident. Dkt. 25-2 at 74. Ms. Lindsay states that she was also informed about the altercation that evening by an associate, whose name she cannot remember. Dkt. 36-4 at 3. Ms. Lindsay contends that this unnamed associate told her that Plaintiff and Mr. Sleight were yelling at each other and she characterized the altercation as "equivalent." Dkt. 36-4 at 3. Ms. Lindsay asserts that she "called [Plaintiff] and [Mr. Sleight] back, and then [she] had gotten names from them to see who else had been involved or seen the altercation." Dkt. 36-4 at 4. Ms. Lindsay said that when she spoke to Plaintiff she thinks "he gave [her] Jim [Miller's] name" as a witness. Dkt. 36-4 at 4. Ms. Lindsay indicates that Mr. Sleight told her witnesses to the confrontation were Chelsea Puetz and Jared Schwartz. Dkt. 36-4 at 4-5. Ms. Lindsay states that the witnesses gave written statements, which she gave to Mr. Johnston. Dkt. 36-4 at 5. Ms. Lindsay contends that she was unfamiliar with the termination process but "checked all the stories that everybody had told [her] and that everyone said the same thing...they heard [Plaintiff] say these words." Dkt. 36-4 at 6. Ms. Lindsay states that only two people saw Plaintiff "chest bump" Mr. Sleight. Dkt. 36-4 at 6. Ms. Lindsay asserts that she pass this information along to Mr. Johnston when he came in the next morning and that she told Mr. Johnston that everyone agrees that Plaintiff "was swearing on the sales floor" and that one person, other than Mr. Sleight, saw Plaintiff threaten Mr. Sleight to start a fight. Dkt. 36-4 at 6. Ms. Lindsay maintains that Mr. Johnston told her to "terminate [Plaintiff] and you write down, 'Gross misconduct' Associate was swearing on the sales floor and

threatening associates." Dkt. 36-4 at 6. Ms. Lindsay contends that Mr. Johnston did not review Plaintiff's personnel file before the decision to terminate Plaintiff was made. Dkt. 36-4 at 7.

Mr. Johnston contends that he decided to terminate Plaintiff after speaking to Mr. Sleight and Mr. Miller, reviewing Plaintiff's personnel file, considering other employees' earlier statements about Plaintiff's unbecoming behavior, and taking into account that his job was to ensure that Wal-Mart was not exposed to any "hostility." Dkt. 25-2 at 78. Mr. Johnston asserts that he made the decision to terminate Plaintiff because Plaintiff used profanity and the "implied threat" of "raising voices and shouting," and that this decision was based on the guidelines of Wal-Mart policy. Dkt. 25-2 at 70-71. Mr. Johnston contends that he did not believe Plaintiff's version of the events because he found Mr. Sleight and Mr. Miller's version of the events more credible. Dkt. 25-2 at 78. Specifically, Mr. Johnston states that this is because "Mr. Sleight and Mr. Miller both furnished statements saying the same " and the statements came from two individuals who do not normally associate with each other. Dkt. 25-2 at 78.

### iii. The Termination Meeting

On October 4, 2007, Defendant terminated Plaintiff's employment for Gross Misconduct. Dkt. 25-2 at 1. Specifically, Plaintiff was "terminated for using profanity on the salesfloor and threatening other associates." Dkt. 25-2 at 1. Plaintiff admits that he understands that threatening employees in the workplace could be grounds for immediate termination. Dkt. 25-2 at 50. Plaintiff states that Alice Knutson, a support manager, and Doris Strudevant, an assistant manager, were present at his termination meeting. Dkt. 35 at 9-10. Ms. Lindsay states that she sat in on Plaintiff's termination meeting. Dkt. 25-3 at 49; Dkt. 25-3 at 69-70. Plaintiff contends that at the termination meeting management stated that Plaintiff was being fired for "using profanity and aggressive behavior." Dkt. 35 at 10. Ms. Strudevant states that when she told Plaintiff he was being terminated he said "God damnit, Doris, you know me," and denied getting into a confrontation with Mr. Sleight. Dkt. 36-2 at 6. Plaintiff asserts that he tried to explain he did nothing wrong and that Mr. Sleight was physical towards him, but that management said nothing and asked Plaintiff to leave the store. Dkt. 35 at 10. Plaintiff admits he raised his voice and was

upset as he was escorted out of the store by either Ms. Knutson or Ms. Sturdevant. Dkt. 35 at 11. Ms. Strudevant contends that Plaintiff did nothing inappropriate in the termination meeting, but was visibly upset. Dkt. 36-2 at 6. Ms. Lindsay states that Plaintiff was "belligerent" and swore at her and Ms. Strudevant. Dkt. 25-3 at 49. Ms. Lindsay contends that Plaintiff "started saying that it was discrimination" because of his age and medical condition and that he was "getting fired because [he had] been there so long and they don't want to pay [him] any more." Dkt. 25-3 at 49-50. Ms. Strudevant states that she escorted Plaintiff out of the store and that he did not act inappropriately as she escorted him out. Dkt. 36-2 at 7.

### iv. After Plaintiff's Termination

Plaintiff contends that after his termination he tried to contact his store manager, Mr. Johnston, by telephone and Mr. Johnson did not respond immediately. Dkt. 35 at 11. Plaintiff states that a few days later he went into the store and met with Mr. Johnston in person. Dkt. 35 at 11. Plaintiff asserts that at this meeting he asked Mr. Johnston why he was being fired and Mr. Johnson responded that "there was nothing [Plaintiff] could do, [he] was being fired, they had witnesses." Dkt. 35 at 11. Plaintiff states that he was upset and crying at this meeting and likely raised his voice a bit. Dkt. 35 at 13. Plaintiff denies telling Mr. Johnston that "he better watch his back." Dkt. 35 at 13. Plaintiff states that he told Mr. Johnston that he was going to call Mr. Johnston's boss and discuss this. Dkt. 35 at 13. Mr. Johnston states that, under the open door policy, he had a telephone call with Plaintiff and Tom Etchells, the district manager, after Plaintiff's termination. Dkt. 25-2 at 79. Mr. Johnston contends that Plaintiff was upset and asked him and Mr. Etchells what the termination was based on. Dkt. 25-2 at 79. Mr. Etchells states that during this meeting Plaintiff told him that he "better be careful here and make the right decision," and that Mr. Etchells felt that this statement was made in a threatening tone. Dkt 25-3 at 6. Mr. Etchells contends that it was his belief that this statement only affirmed Mr. Johnston's decision to terminate Plaintiff. Dkt. 25-3 at 6.

Plaintiff states that at this post-termination meeting he asked Mr. Johnston if the cameras in the store had captured the incident. Dkt. 35 at 13. Plaintiff states that Mr. Johnston responded

that there was no tape of the incident. Dkt. 35 at 13. Mr. Johnston states that after this conversation he looked at the camera shots. Dkt. 25-2 at 83. Mr. Johnston contends that he "went into the room that contains the video screens that have the camera shots and reviewed the camera shots," but "there was no camera shot of the aisle where the incident occurred." Dkt. 25-2 at 76-77.

Plaintiff asserts that after he met with Mr. Johnston he called Mr. Etchells, the regional manager, to discuss his termination. Plaintiff contends that Mr. Etchells told him that he "can't be fired for using profanity, that [was] a verbal warning," and that this verbal warning was "the smallest, verbal, and then written and then decision day." Dkt. 35 at 13. Plaintiff states that Mr. Etchells told him that he would investigate this matter thoroughly and quickly and get back to Plaintiff within a couple days. Dkt. 35 at 13. Mr. Etchells states that he did not tell Plaintiff that he would call Mr. Johnston and look into the reason for Plaintiff's termination. Dkt. 25-3 at 3.

Mr. Etchells contends that he spoke with Mr. Johnston and that Plaintiff was terminated for "basically threatening another associate," and that he recalled "chest butting, coming up to it, another associate, and one provoked a fight." Dkt. 25-3 at 3. Mr. Etchells states that Mr. Johnston also mentioned that Plaintiff swore. Dkt. 25-3 at 3-4. Mr. Etchells maintains that Mr. Johnston told him that he relied on statements from other associates to make the decision to terminate Plaintiff. Dkt. 25-3 at 4. Mr. Etchells states that as a standard disciplinary procedure for swearing on the salesfloor Wal-Mart would usually "coach for improvement" and provide written counseling or a write-up and "if this ever happens again," the employee would be terminated. Dkt. 25-3 at 8. Mr. Etchells asserts that for workplace violence an employee would be automatically terminated. Dkt. 25-3 at 8. Mr. Etchells contends that Mr. Johnston "was convinced that the physical contact had occurred based on the facts that he had" in the statements. Dkt. 25-3 at 8.

### C. Plaintiff's Restriction from Wal-Mart Property:

Plaintiff admits after he was terminated that he had to go to Wal-Mart to pick up some paperwork and he approached Mr. Sleight's car in the Wal-Mart parking lot. Dkt. 25-2 at 47. Mr.

Sleight states that this was approximately a week after Plaintiff's termination. Dkt. 25-3 at 64-65. Plaintiff states that Mr. Sleight "jumped out of his car like [Plaintiff] was going to hit him or fight him," and Mr. Sleight "put his hands up like he was going to fight [Plaintiff]." Dkt. 25-2 at 48. Plaintiff contends that he told Mr. Sleight "I don't even know why you did this, why you are doing this." Dkt. 25-2 at 48. Mr. Sleight states that Plaintiff "popped up in the parking lot one morning and was standing right next to the driver's side of my truck, sitting there basically telling me how I lied, and how could I get him fired." Dkt. 25-3 at 64-65. Mr. Sleight contends that Plaintiff was "waiting" by his truck for him. Dkt. 25-3 at 65. Mr. Sleight asserts that Plaintiff was "yelling at the top of his lungs" and swore at him. Dkt. 25-2 at 65-66. Plaintiff maintains that he then turned around and walked away from Mr. Sleight. Dkt. 25-2 at 48. Plaintiff states that management then came out to the parking lot and told him to leave, which he contends that he did. Dkt. 25-2 at 48. Mr. Sleight states that management "verbally" pulled Plaintiff away from his vehicle. Dkt. 25-2 at 67. Mr. Sleight contends that after this incident he went to the courthouse in Shelton to get the paperwork to file a restraining order against Plaintiff, but never actually filed one against him. Dkt. 25-2 at 64

While Plaintiff was employed at Wal-Mart, his wife was also a Wal-Mart employee. Dkt. 25-2 at 31. The same year as Plaintiff's termination from Wal-Mart, he was also going through a divorce from his now ex-wife. Dkt. 25-2 at 31. She took a restraining order out against Plaintiff, which required him to work in a separate area of the store away from her. Dkt. 25-2 at 32-33. Plaintiff states that, despite the restraining order, after his termination he may have seen his now ex-wife at the store and tried to speak with her, but she did not want to talk and Plaintiff continued on his way. Dkt. 25-2 at 48-49. Plaintiff states that he believes that Defendant may have restricted him from Wal-Mart property because his "wife worked there and she had a restraining order against [him] [and] that made it easier for them." Dkt. 25-2 at 52.

Defendant, on January 17, 2008, issued a Notification of Restriction from Property to Plaintiff informing him that he had "been banned from all Wal-Mart property, and that to enter

onto any such property places [him] at risk for arrest and prosecution for Criminal Trespass."

Dkt. 25-2 at 19. The Notification states that:

> "Pursuant to law, Wal-Mart Stores, Inc., chooses to exercise its right to restrict entrance to individuals who have conducted themselves in a manner which is not acceptable to the community, including, but not limited to, shoplifting or destruction of property. It is deemed that the undersigned apprehended subject poses a threat to the future security of Wal-Mart facilities and properties, and therefore, is no longer welcome on Wal-Mart property, within its stores, or on any property under its immediate control."

Dkt. 25-2 at 19. The notice further states that "it is not necessary that the undersigned apprehended subject be caught in an illegal act, including, but not limited to, shoplifting or destroying property; the mere presence of such individual of the property is sufficient." Dkt. 25-2 at 19.

Mr. Johnston states that he was not specifically involved in the decision to restrict Plaintiff from Wal-Mart property. Dkt. 25-2 at 81. Mr. Johnston contends that his co-manager Minerva (whose last name is unknown) and assistant manager, Mark Chenowitz, made the decision to restrict Plaintiff from Wal-Mart property. Dkt. 25-2 at 81 Mr. Chenowith states that he restricted Plaintiff from the property because he was concerned that Plaintiff kept returning to the store "causing problems," specifically, Plaintiff was using profanity, bothering other associates, and management was concerned about the restraining order against Plaintiff. Dkt. 25-2 at 40. Ms. Knutson states that Plaintiff came onto to Wal-Mart property and called her an "F-ing bitch." Dkt. 25-3 at 44.

### D. Wal-Mart's Coaching Process:

Defendant utilizes a coaching process, which is "an informal, ongoing process of helping Associates achieve results by building on Associates' strengths, developing their skills, providing encouragements and increasing their confidences." Dkt. 25-2 at 10. Defendant states that it uses this coaching process "when an Associate's behavior (job performance or misconduct) falls to meet the Company's expectations" and that it "is designed to be progressive." Dkt. 25-2 at 10. Defendant states that managers should "always start at the appropriate Coaching Level

depending on the classification of behavior to be addressed" and that "more serious levels of coaching are used at appropriate intervals." Dkt. 25-2 at 10.

Defendant contends that "there will be some situations where use of Coaching process is not warranted and instead, the Associate's employment is automatically terminated" like Gross Misconduct. Dkt. 25-2 at 10. The Wal-Mart Associate Handbook also states that "there are...certain actions of misconduct that may result in immediate termination" including, but not limited to "fighting/assault or threats," "serious harassment/inappropriate conduct," and "rude or abusive conduct toward a customer or Associate." Dkt. 25-2 at 24. Defendant states that the Coaching for Improvement process "will not be used to address gross misconduct." Dkt. 25-2 at 12. Defendant asserts that "Associates who are deemed to have engaged in Gross Misconduct are subject to immediate termination," and that Gross Misconduct "will not be tolerated." Dkt. 25-2 at 12. Defendant maintains that Gross Misconduct includes: "serious harassment/inappropriate conduct," "fighting/assault," and "rude/abusive conduct toward a Customer/Member or another Associate." Dkt. 25-2 at 13.

Defendant asserts that Wal-Mart maintains a strict Workplace Violence Policy, which provides that "any Associate who violates this policy will be disciplined up to and including termination from the Company." Dkt. 25-2 at 15. Defendant states that behavior like "pushing," "veiled threats of harm," "intimidation," "fighting," and "challenging another person to fight" will not be tolerated. Dkt. 25-2 at 15. Plaintiff admits that he was trained in Wal-Mart's workplace violence policy and understood that threatening employees was grounds for immediate termination. Dkt. 25-2 at 50-51. In this Workplace Violence Policy, Defendant provides a procedure for managers to investigate complaints of workplace violence, which includes: getting the facts from the claimant, establishing the details of the event, talk to third parties such as witnesses to the event, talk to the alleged offender, evaluate the situation and obtain written statements. Dkt. 25-2 at 17.

On April 25, 2001, Plaintiff signed an Acknowledgment, which states that:

"This handbook is intended solely as a general information guide to let Associates know about the current policies and programs Wal-Mart has in place. The policies and benefits presented in this handbook are for your information and do not constitute terms or conditions of employment. This handbook supersedes all prior handbooks. This handbook is not a contract."

Dkt. 25-2 at 25. The Acknowledgment also states that "I understand that the information contained in this handbook are guidelines only, and are in no way to be interpreted as a contract." Dkt. 25-2 at 25

### III. <u>ANALYSIS</u>

Under the *Erie* doctrine, this Court, when exercising diversity jurisdiction in an action based on state law, applies state substantive law and federal procedural law. *Walker v. Armco Steel Corp.,* 446 U.S. 740, 748 (1980).

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (non-moving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed.R.Civ.P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### A. Plaintiff's Claims of Discrimination and Retaliation

The Washington Law Against Discrimination constitutes an exception to the general rule that an employer may terminate an employee for good cause, no cause, or even morally wrong cause; the statute prohibits discrimination in hiring or discharge on the basis of race, gender, disability, or other enumerated characteristics. *McClarty v. Totem Elec.,* 157 Wn.2d 214, 221 (2006) *subsequently vacated and superseded by statute,* RCW 49.60.040(25)(a) (2006)*, on other grounds*. Washington courts have adopted the burden-shifting framework announced in *McDonnell Douglas* by the United States Supreme Court for claims of age and disability discrimination and retaliation for filing a worker's compensation claim. *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172 (2001) *overruled on other grounds by McClarty v. Totem Elec.,* 157 Wn.2d 214 (2006) *subsequently vacated and superseded by statute on other grounds; see also Renz v. Spokane Eye Clinic, P.S.,* 114 Wn. App. 611, 618-19 (2002).

Under this burden-shifting framework, the plaintiff must first establish a prima facie case of unlawful discrimination or retaliation. *Hill*, 144 Wn.2d at 181 *citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once the plaintiff establishes a prima facie case, the burden shifts back to the defendant to provide a legitimate nondiscriminatory reason for the adverse employment action. *Hill*, 144 Wn.2d at 181. To overcome the defendant's proffered

reason, the plaintiff must produce evidence sufficient to indicate that it was merely pretext for discrimination. *Hill*, 144 Wn.2d at 182. If the plaintiff cannot make this showing, the defendant becomes entitled to judgment as a matter of law. *Hill*, 144 Wn.2d at 182.

*i. Plaintiff's Claim of Disability Discrimination*

The plaintiff in order to make out a prima facie case of disability discrimination must show that he (1) was disabled; (2) suffered an adverse employment action; (3) performed satisfactorily; and (4) was discharged under circumstances that raise a reasonable inference of unlawful discrimination. *Callahan v. Walla Walla Housing Authority*, 126 Wn. App. 812, 819 (2005) *citing Roeber v. Dowty Aerospace Yakima*, 116 Wn. App. 127 (2003); *Chen v. State*, 86 Wn. App. 183, 189 (1997).

Under WLAD, disability is statutorily defined as "the presence of a sensory, mental, or physical impairment that: (i) is medically cognizable or diagnosable; or (ii) exists as a record or history; or (iii) is perceived to exist whether or not it exists in fact." RCW 49.60.040(7)(a). The definition states that "[a] disability exists whether it is temporary or permanent, common or uncommon, mitigated or unmitigated, or whether or not it limits the ability to work generally or work at a particular job or whether or not it limits any other activity within the scope of this chapter." RCW 49.60.040(7)(b). Washington's case law is scarce on what is defined as a disability, because, in 2007, the Washington State Legislature in adopted RCW 49.60.040(7)(a), which overruled the Washington State Surpreme Court's decision in *McClarty* that defined a disability as the same definition under the Americans with Disabilities Act of 1990. *See Delaplaine v. United Airlines, Inc.*, 518 F.Supp.2d 1275, 1276-1279 (W.D.Wash. 2007) (discusses the statute's effect on *McClarty*). But, WLAD still prohibits discrimination based on a real or perceived disability. *Callahan,* 126 Wn. App. at 820.

Here, it is unclear whether Plaintiff's alleged injuries would be characterized as a disability under the statute, because (1) Plaintiff offered very little evidence concerning these alleged injuries and (2) Washington case law is scare on this issue. However, the Court views the facts in the light most favorable to the nonmoving party, and the Court will assume that

Page 18    - ORDER

Plaintiff's undiagnosed arm pain and knee injuries were disabilities under RCW 49.60.040(7)(a).

Even assuming that Plaintiff had a disability, Plaintiff is unable to make out a prima facie case of disability discrimination, because he does not offer sufficient evidence to raise a question of fact as to whether he was terminated under circumstances that raise a reasonable inference of unlawful discrimination. First, Plaintiff cannot show that the members of management that decided to terminate him knew about his arm pain; specifically, Plaintiff told Mr. Fritz about the arm pain around August 2007. Dkt. 35 at 5. Plaintiff has produced no evidence that Mr. Fritz was involved in the decision to terminate Plaintiff. Dkt. 25-2 at 78; Dkt. 36-4 at 6. The managers that terminated Plaintiff, Mr. Johnston and/or Ms. Lindsay, did not know about Plaintiff's undiagnosed arm pain before they made the decision to terminate him. Dkt. 25-2 at 63; Dkt. 25-3 at 54.

Second, Plaintiff cannot show that Mr. Johnston knew about Plaintiff's knee injuries. Dkt. 25-2 at 63-64 (Mr. Johnston states that he was unaware Plaintiff suffered from a knee injury or other physical ailment). On the other hand, Ms. Knutson (an assistant manager who was present at Plaintiff's termination meeting but appears not to have been involved in the decision to terminate him) knew of his knee pain but it appears that she and other managers tried to lessen Plaintiff's on-the-job exposure to more knee pain. Dkt. 36-3 at 9 (Ms. Knutson states that management "always kept [Plaintiff] over on the grocery side so he didn't have to go up and down ladders.") This statement does not support Plaintiff's contention that he was fired for his disability. It suggests that Defendant had a willingness to accommodate his knee injuries. Even viewing the facts in the light most favorable to the nonmoving party, Plaintiff does not make a sufficient showing that it is reasonable to infer that he was terminated because of his alleged disabilities.

Even if Plaintiff can establish a prima facie case, Defendant has offered a legitimate nondiscriminatory reason for Plaintiff's termination; namely, that Plaintiff was terminated because he was involved in an on-the-job confrontation with another associate on the sales floor. Dkt. 25-2 at 70-71. Although Plaintiff contends that the proffered reason *must be* pretextual

because of the all disputed facts surrounding the confrontation, the Court should grant the Defendant's motion for summary judgment on this issue, because Plaintiff produced no direct or circumstantial evidence of discriminatory intent and a flawed investigation alone does not create an issue of fact. *See Hill*, 144 Wn.2d at 185-186 (to survive summary judgment a Plaintiff must show that a reasonable judge or jury could find that his disability was a substantial motivating factor in his termination.); *see also Hines v. Todd Pacific Shipyards Corp.*, 127 Wn. App. 356, 372 (2005) (stating that "speculation and belief are insufficient to create a fact issue as to pretext. Nor can pretext be established by mere conclusory statements of a plaintiff who feels that he has been discriminated against.") *quoting McKey v. Occidental Chem. Corp.*, 956 F.Supp. 1313, 1319 (S.D.Tex.1997). Plaintiff did not show that Mr. Johnston, the store manager who ultimately terminated his employment, knew about Plaintiff's knee injuries or arm pain. Dkt. 25-2 at 63-64. Furthermore, Plaintiff contends he reported his arm pain to Mr. Fitz, but none of the managers that made the decision to terminate Plaintiff knew about the alleged injury. Dkt. 25-2 at 63; 25-3 at 54.

Although Defendant's investigation can arguably be described as flawed, the Plaintiff produced no evidence that this flawed investigation was pretextual. Plaintiff attempts to rely on the fact that the investigation was so completely flawed that this creates a reasonable inference that it must have been pretextual. However, a flawed investigation alone does not create reasonable inference that a judge or jury could find that his disability was a substantial motivating factor for Plaintiff's termination. The Plaintiff must produce sufficient evidence to indicate that the confrontation and subsequent investigation was merely pretext for discrimination; Plaintiff has not met this burden. *See Hill*, 144 Wn.2d at 188-189 ("there will be instances where although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.") *citing Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 (2000); *see also Domingo v. Boeing Employees' Credit Union*, 124 Wn.App. 71, 87 (violent or harassing behavior is a legitimate reason for termination.); *see also Roeber v. Dowty*

*Aerospace Yakima*, 116 Wn. App. 127, 137-138 (plaintiff failed to produce evidence that defendant's legitimate nondiscriminatory reason, namely that employee was violent, was pretextual, and the court stated that it is not unlawful for an employer to discharge an employee because the employee is perceived to have misbehaved.)

The court, in *Domingo,* held that the plaintiff did not produce sufficient evidence that her employee's investigation into her violent misconduct was pretextual, because the plaintiff only "complain[ed] that management did not listen to her side of the story." 124 Wn. App. at 89. The court stated that the plaintiff in *Domingo* did not "dispute that coworkers complained about her conduct, that [the employer] investigated the complaints, or that she received a written warning about her violent behavior," and the plaintiff presented no evidence that her employer did not, in good faith, believe that she had engaged in violent conduct. *Id*. Plaintiff's claim of pretext is analogous to *Domingo* because he can only point to his disagreement with the outcome of his employer's investigation. Plaintiff does not dispute that he got into an altercation with Mr. Sleight, but rather he disputes whether he got physical or whether he swore; this is not sufficient to meet Plaintiff's burden to overcome pretext. The Court should grant the Defendant's motion for summary judgment on this issue, because Plaintiff failed to produce sufficient evidence that Defendant's motivation to terminate him was pretextual.

*ii. Plaintiff's Claim of Age Discrimination:*

Under Washington law, it is an unfair practice to discriminate in employment against an individual who is 40 years of age or older. RCW 49.44.090(1). Washington law looks to federal cases construing the Age Discrimination in Employment Act for guidance. *Grimwood v. University of Puget Sound, Inc.,* 110 Wn.2d 355, 361 (1988). In order for the plaintiff to establish a prima facie case of age discrimination, the plaintiff must show that he (1) was within the statutorily protected age group; (2) suffered an adverse employment action; (3) performed satisfactorily; and (4) was replaced by a younger person. *Domingo v. Boeing Employees' Credit Union*, 124 Wn. App. 71, 86-87 (2004). In this case, Plaintiff fails to make out a prima facie case of age discrimination because he does not provide any evidence that Plaintiff was replaced by a

younger worker. *See* Dkt. 33 Plaintiff's Response to Defendant's Motion for Summary Judgment. Plaintiff failed to provide any specifics on who was his replacement. Furthermore, Plaintiff admits that there were other stockers at Wal-Mart that were older than him and they did not get terminated. Dkt. 25-2 at 55-57.

Even if Plaintiff can establish a prima facie case of age discrimination, Plaintiff has not shown, much like disability discrimination, that Defendant's proffered legitimate nondiscriminatory reason was pretextual. Plaintiff points to comments that were made concerning his age and the fact that he was going up and down ladders with totes on his shoulders. Dkt. 25-2 at 53. However, Plaintiff does not recall the names of these managers and admits they are no longer employees of Wal-Mart. Dkt. 25-2 at 53. Also, Plaintiff believes that these comments may have been jokes and were made two to four years prior to his termination. Dkt. 25-2 at 53-54. These vague statements do not create a sufficient inference that a reasonable trier of fact could find in Plaintiff's favor.

Plaintiff also points to some comments made by Ms. Knutson and Frankie (his last name is unknown) concerning his age. Dkt. 25-2 at 59. Plaintiff states that they asked him if he aspired to be more than just a stocker and become a manager. Dkt. 25-2 at 59. Plaintiff contends that he thought the comments were made in jest, but some of them "hit a nerve." Dkt. 25-2 at 60. Although Ms. Knutson appears to be involved in the decision to terminate Plaintiff, these statements are positive and do not provide evidence of a discriminatory intent. Finally, similar to this Court's discussion of Plaintiff's claim of disability discrimination, Plaintiff engaged in an on-the-job confrontation with another Associate. His disagreement with management's findings does not create a genuine issue of fact. For these reasons, the Court should grant Defendant's motion for summary judgment on the issue of age discrimination.

### iii. Plaintiff's Claim of Retaliation for Communicating an Intent to File a Worker's Compensation Claim:

Under RCW 51.48.025(1), "No employer may discharge or in any manner discriminate against any employee because such employee has filed or communicated to the employer an

intent to file a claim for compensation." Under Washington law, a plaintiff, who alleges that his or her employer retaliated against him or her for filing or communicating an intent to file a worker's compensation claim, could (1) bring an action under RCW 51.48.025(2) with the Director of Labor and Industries within 90 days of the alleged adverse employment event, or (2) file a common law claim for wrongful discharge. *Wilmot v. Kaiser Aluminum & Chem. Corp.,* 118 Wn.2d 46, 51 (1991). In this case, it is not immediately apparent to the Court, which optional claims for retaliation the Plaintiff elects, but the elements of either optional claim appear to be the same.

In order to establish a prima facie case for retaliation, the plaintiff must show that (1) he filed or communicated to his employer an intent to file a worker's compensation claim; (2) his employer terminated his employment; and (3) there is a causal link between his worker's compensation claim and his employment termination. *Wilmot*, 118 Wn.2d at 68-69.

First, it appears that Plaintiff did not communicate his intent to file a workers' compensation claim and, therefore, does not meet the first element of a prima facie case. Specifically, Plaintiff did not state he was going to file a worker's compensation claim when he told Mr. Fritz about his arm pain. Dkt. 35 at 5. It would be difficult to infer from the alleged conversation that Plaintiff's vague statements were sufficient to communicate an intent to file a worker's compensation claim, because Plaintiff merely told Mr. Fritz that he was having arm problems and Mr. Fritz told him to get it checked out. *Id*. From the plain language of the statute, it appears that Plaintiff has not met his burden.

Second, Plaintiff does not produce sufficient evidence to show a causal link between his intent to file a worker's compensation claim and his employment termination. To establish a causal connection, the plaintiff must show that the retaliation was a "substantial factor" behind the decision to terminate his employment. *Francom v. Costco Wholesale Corp.,* 98 Wn. App. 845, 862 (2000). Plaintiff admits that he never told any of the managers involved in his termination, namely Mr. Johnston, Ms. Sturdevant or Ms. Knutson, that he was suffering from arm or wrist problems. Dkt. 25-2 at 58. Mr. Johnston and Ms. Lindsay both state that they were

unaware of Plaintiff's arm problems. Dkt. 25-2 at 63; Dkt. 25-3 at 54. If the managers that made the decision to terminate Plaintiff were unaware of his arm pain, it is difficult to establish a causal connection between the statements about his arm pain and his subsequent termination. Plaintiff also suffered from knee problems and had "filed a SIF 2 (Self-Insurer Accident Report) No. W78789 due to an aggravation of his condition as a result of a fall he took on the job on or around September 14, 2002." Dkt. 4 at 22. Plaintiff states that there was no worker's compensation claim prosecuted for that injury. Dkt. 4 at 22. Plaintiff also fails to make out a prima facie case because this event, in 2002, is too remote in time from his termination, in 2007, to create an inference of a causal connection. In *Anica v. Wal-Mart Stores, Inc.,* 120 Wn. App. 481, 489 (2004), the court reasoned that the plaintiff failed to meet her burden of producing evidence that she was discharged under circumstances that raise a reasonable inference of unlawful discrimination. In that case, the plaintiff argued that close timing between her return to work, after an on-the-job injury, and her termination for not producing a Social Security Number is sufficient to establish this element. *Anica*, 120 Wn. App. at 489. However, the court disagreed stating that "coincidence is not proof of causation." *Id*. The court further reasoned that the defendant did not fire the plaintiff after her two earlier on-the-job injuries, all the while requesting proof of a Social Security Number, supported the employer's contention that it tolerated and accommodated the plaintiff's worker's compensation claims. *Id*. Here, Plaintiff was not terminated until 2007 for an on-the-job confrontation; this is too remote in time to create a causal connection for his 2002 knee injury.

Even if Plaintiff makes out a prima facie case of retaliation for filing or communicating an intent to file a worker's compensation claim, Plaintiff did not produce evidence sufficient to overcome Defendant's proffered legitimate nondiscriminatory reason. Much like this Court's earlier discussion of pretext in relation to Plaintiff's claim of disability discrimination, Mr. Johnston, who decided to terminate Plaintiff, did not know about his knee injuries or his arm pain. Furthermore, Plaintiff's disagreement with the findings of the investigation is not sufficient

to show pretext. For these reasons, the Court should grant Defendant's Motion for Summary Judgment on the claim of retaliation for filing a worker's compensation claim.

### B. Plaintiff's Wrongful Termination/Breach of Contract Claim

At common law an at will-employee could be discharged for any reason. *Gardner v. Loomis Armored, Inc.,* 128 Wn.2d 931, 935 (1996). However, when an employer makes a promise, in writing, that guarantees specific treatment in specific situations and the employee is induced to remain on the job and not actively seek employment because of these promises, they can become an enforceable part of the employment relationship, even where the relationship is at will. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 230 (1984). In order to sustain a claim for breach of promise of specific treatment, the plaintiff must prove these elements of the cause of action: (1) that a statement (or statements) in an employee manual or handbook or similar document amounts to a promise of specific treatment in specific situations, (2) that the employee justifiably relied on the promise, and (3) that the promise was breached. *Korslund v. Dyncorp Tri-Cities Services, Inc.,* 156 Wn.2d 168, 184-185 (2005) *citing Bulman v. Safeway, Inc.,* 144 Wash.2d 335, 340-41 (2001); *Thompson,* 102 Wn.2d at 233. Typically, each of these elements is presented as an issue of fact, but where reasonable minds could not differ in resolving them, these elements could be decided as a matter of law. *Korslund*, 156 Wn.2d at 185. The promise of a specific treatment claim rests on a theory of justified reliance. *Id*.

The Washington Supreme Court, in *Thompson*, stated that there are situations where the employer is not bound by statements in employment manuals, for instance if the employer "specifically state[s] in a conspicuous manner that nothing contained therein is intended to be part of the employment relationship and are simply statements of company policy," or when "policy statements as written may not amount to promises of specific treatment and merely be general statements of company policy and, thus, not binding." 102 Wn.2d at 230-231. However, in *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 532 (1992), the court rejected the premise that "a disclaimer can, as a matter of law, effectively serve as an eternal escape hatch for an employer

who may then make whatever unenforceable promises of working conditions it is to its benefit to make," and "[a]n employer's inconsistent representations can negate the effect of a disclaimer."

Plaintiff argues that he justifiably relied upon the "progressive discipline" scheme in that he "assumed he would get a fair hearing under the progressive discipline at Wal-Mart" so that he could try to explain his side of the story before his termination. Dkt. 33 at 12. Plaintiff states that "it was the offer of fairness at Wal-Mart, which including its discipline policies, that kept [him] from looking for employment elsewhere." Dkt. 35 at 2. The Workplace Violence Policy did provide management with some policies as to how to investigate an allegation of workplace violence, and it states that management must "request the alleged offender's view of what is alleged to have occurred " and to "be certain to inform the alleged offender that our policy requires that an investigation be made." Dkt. 25-2 at 17. It is unclear whether Plaintiff had access to this Workplace Violence Policy and, therefore, whether he justifiably relied upon it. However, because the facts are viewed in the light most favorable to the nonmoving party, the Court will assume that Plaintiff had access to this policy. Assuming the facts in the light most favorable to the plaintiff, Defendant *always retained* the right to side step the coaching process and automatically terminate any employee for Gross Misconduct or a violation of the Workplace Violence Policy. Dkt. 25-2 at 10; Dkt. 25-2 at 15. The language is unambiguous that the coaching process was not always warranted and termination may be appropriate. Dkt. 25-2 at 10 ("there will be some situations where use of the Coaching process is not warranted and instead, the Associate's employment is automatically terminated" like Gross Misconduct); Dkt. 25-2 at ("Any Associate who violates this [Workplace Violence] policy will be disciplined up to and including termination from the Company"). Defendant knew that the policies were not a contract, only guidelines because he signed an "Acknowledgement" of such. Dkt. 25-2 at 25. Defendant also knew that if he threatened another associate he could be terminated. Dkt. 25-2 at 50. Reasonable minds could not differ on this issue, and, therefore, Plaintiff could not have justifiably relied upon these guidelines.

While the actual facts of the investigation may be disputed, there is no doubt that an investigation occurred and no doubt that Plaintiff's side of the story was given to either Ms. Lindsay or Mr. Johnston. Dkt. 36-4 at 6; Dkt. 36-5 at 6. In fact, both Ms. Lindsay and Mr. Johnston stated that they spoke with Plaintiff and obtained his side of the story. *Id.* Plaintiff did get an opportunity to tell his side of the story and to try to convince management that he was not violent, did not swear, and did not threaten another associate. Dkt. 25-2 at 50. Although Plaintiff does not agree with the final outcome of the investigation, Plaintiff does not assert that no altercation took place, but rather Plaintiff disputes whether he used profanity, whether he threatened another associate, and whether there was physical violence. But Defendant conducted an investigation, which was all, even if flawed, that was guaranteed to Plaintiff under Wal-Mart policies. Mr. Johnston was convinced that physical contact had occurred based on the facts that he had and made the decision to terminate Plaintiff because of Gross Misconduct. Dkt. 25-2 at 14. It appears that Defendant made this decision because it needed to ensure the safety of its customers and other associates and Defendant had the right to decide that it did not have to put up with violence in the workplace.

Plaintiff states that Mr. Etchells told him that he could not be fired for using profanity on the sales floor, and the smallest verbal warning would be given if that was the case. Dkt. 35 at 14. Mr. Etchells contends that he did not make this statement. Dkt. 25-3 at 4. Assuming that Mr. Etchells did make this statement, Plaintiff could not justifiably rely on this statement because it was made after Plaintiff was terminated. There is also a dispute of fact whether Mr. Johnston, the store manager, reviewed Plaintiff's personnel file before he was terminated, but nowhere in the Workplace Violence Policy does it state that management must review a personnel file before termination. Dkt. 36-4 at 7; Dkt. 25-2 at 15-18. Finally, reasonable minds could not differ on whether these policies were only guidelines, which Plaintiff acknowledged, and that Plaintiff could not justifiably rely upon them. For these reasons, Defendants motion for summary judgment on the issue of breach of contract should be granted.

## C. Plaintiff's Claim of Defamation

In order for a plaintiff to survive a defendant's motion for summary judgment, the plaintiff must show that there are disputed material facts concerning the elements of defamation, specifically: (1) a false and defamatory communication, (2) a lack of privilege, (3) fault, and (4) damages. *Woody v. Stapp,* 146 Wn. App. 16, 21 (Div. 3 2008) *citing Mohr v. Grant*, 153 Wn.2d 812, 822 (2005). A plaintiff can defeat a summary judgment motion by presenting "specific, material facts" sufficient to support the existence of each element of defamation. *Mohr v. Grant*, 153 Wn.2d 812, 822 (2005). The burden of proving falsity is on the party claiming defamation. *Schmalenberg v. Tacoma News, Inc.,* 87 Wn. App. 579, 590 (1997).

In this case, Plaintiff argues that Defendant is liable for defamation because it issued a "Notice of Restriction from Property" and opposed Plaintiff's application for unemployment benefits. Dkt. 4 at 23. However, Plaintiff provides no facts or argument in opposition to Defendant's motion for summary judgment on the issue of defamation. *See* Dkt. 33. In this case, Defendant argues that Plaintiff cannot prove that (1) the restriction notice or the opposition to his unemployment benefits application is false; (2) Defendant did not publish the restriction notice; (3) Defendant acted negligently; and (4) he suffered actual damages. Dkt. 24 at 22–24. Defendant argues that even if the notice was published, this action was privileged because Wal-Mart shared a "common interest" with third parties to keep the store safe. Dkt. 24 at 24. Furthermore, Defendant contends that it has "absolute immunity under RCW 4.25.510 for statements made to the ESD in defense of Plaintiff's benefits claim." Dkt. 24 at 25. Plaintiff does not dispute Defendant's arguments and it appears that the facts of the case support them. Namely, Defendant had a proper rationale to restrict Plaintiff from the property. Dkt. 25-2 at 40; *see* Dkt. 25-2 at 48 (Plaintiff showed up on Wal-Mart property after his termination and spoke with Mr. Sleight); *see* Dkt. 25-2 at 48-49, 52 (Plaintiff's ex-wife had a restraining order against him and he tried to speak with her on Wal-Mart property); and, *see* Dkt. 25-3 at 44 (Plaintiff used profanity when he came back on Wal-Mart property after his termination). For these reasons, the Court should grant the Defendant's motion for summary judgment on Plaintiff's claim of defamation.

Finally, because this Court should grant the Defendant's motion for summary judgment on all issues, the Court will not address Defendant's argument that after-acquired evidence cuts off Plaintiff's alleged damages. Dkt. 24 at 26.

## IV. <u>DEFENDANT'S MOTION TO DISMISS UNTIMELY JURY DEMAND AND FOR SETTING OF BENCH TRIAL:</u>

The Court has determined that it should grant Defendant's motion for summary judgment, and as a result, Plaintiff's claims will be dismissed. For this reason, the Court should strike Defendant's Motion to Dismiss Untimely Jury Demand and for Setting of Bench Trial (Dkt. 22) because it is moot. All other pending motions are moot.

## V. <u>ORDER</u>

Therefore, it is hereby, **ORDERED** that:

- Defendant's Motion for Summary Judgment (Dkt. 24) is **GRANTED**;
- Defendant's Motion to Dismiss Untimely Jury Demand and for Setting of Bench Trial (Dkt. 22) is **STRICKEN AS MOOT**;
- Plaintiff's Motion in Limine (Dkt. 65) is **STRICKEN AS MOOT**;
- Defendant's Motion in Limine (Dkt. 66) is **STRICKEN AS MOOT**;
- Plaintiff's Motion for Extension of Time (Dkt. 68) is **STRICKEN AS MOOT**;
- Plaintiff's claims are **DISMISSED**; and

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 21st day of December, 2009.

ROBERT J. BRYAN
United States District Judge